IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ELAINE JACKSON, individually and | § | |
| as next friend of CHEIKH JACKSON | § | |
| and OKOFO JACKSON, and | § | |
| DEWAYNE CHARLESTON, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-07-3086 |
| | § | |
| WALLER INDEPENDENT SCHOOL | § | |
| DISTRICT, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND OPINION

The plaintiffs, Elaine Jackson, whose children attend the historically black elementary school in the Waller Independent School District ("WISD"), and DeWayne Charleston, who lives and is registered to vote in the WISD, allege that this elementary school lacks adequate funding and has dilapidated facilities that are a vestige of the racial segregation in the WISD. The plaintiffs also challenge at-large voting to elect the school board members and other aspects of recent school board and bond elections as offensive to the Constitution and federal civil rights statutes.

On March 24, 2008, this court dismissed the plaintiffs' challenges to the school bonds approved by the WISD voters in 2007. The dismissal was based on the state court judgment in a bond-validation proceeding filed by the WISD, in which the plaintiffs intervened. (Docket Entry No. 22). On June 27, 2008, this court issued a memorandum and opinion denying the plaintiffs' motion for reconsideration of the dismissal. That opinion clarified that the plaintiffs could litigate in this federal case "their claims that the WISD violates federal equal protection and other rights,

including under 20 U.S.C. § 1706, because the district provides 'unequal educational opportunities for minority students in and around the City of Prairie View,' provides 'unequal distribution of bond funds to Jones Elementary,' and because 'facilities in Prairie View are inferior to those found elsewhere in the district.'  And the state-court bond-validation proceeding judgment does not limit the plaintiffs' pursuit of the claims they raised in the third amended complaint, challenging the constitutionality of at-large voting for school board trustees and other aspects of school board elections and governance."  (Docket Entry No. 52, at 37–38).

The WISD has moved for summary judgment dismissing the plaintiffs' claims that the WISD violates the Equal Educational Opportunity Act ("EEOA"), 20 U.S.C. § 1701 *et seq.*, and the Equal Protection Clause because of unequal funding and inferior facilities, as well as the plaintiffs' claim for a declaratory judgment and injunctive relief.[1]  (Docket Entry No. 32).  The WISD also moved for summary judgment on the plaintiffs' constitutional challenge to the Texas Expedited Declaratory Judgment Act (EDJA).  (Docket Entry No. 41).  The plaintiffs argue that the WISD's funding allocation decisions are irrational because although Jones Elementary is dilapidated, the district has spent millions of dollars on predominantly white elementary schools and on a new football stadium for the high school.  The plaintiffs argue that the state court's judgment under the Texas EDJA prevents them from litigating their federal claims in this court.  The WISD replied, (Docket Entry No. 42), and filed a supplemental reply, (Docket Entry No. 47), and the plaintiffs filed a surreply, (Docket Entry No. 51).  The plaintiffs filed a supplemental brief on their EEOA claim, (Docket

---

[1]   The order filed on January 30, 2009 stated that the WISD's motion, which had sought dismissal under Rule 12(b)(6) as well as summary judgment under Rule 56(c), would be treated as one for summary judgment.

Entry No. 57), to which the WISD responded and filed two supplements to the summary judgment record,  (Docket Entry Nos. 58, 65, 66).

Based on a careful review of the pleadings, the motion, response, and replies, the parties' submissions, and the applicable law, this court grants the WISD's motion for summary judgment on the EEOA, equal protection, and declaratory judgment claims.  Under the scheduling order entered in June 2009 to govern the plaintiffs' challenge to at-large voting to elect WISD trustees, plaintiffs will designate witnesses by October 23, 2009, the WISD will designate responsive witnesses by November 30, 2009, and the joint pretrial order is due on February 5, 2010.

The reasons for the rulings set out in this opinion are explained in detail below.

## I.      Background

This case arises against the backdrop of a long history of racial segregation and discrimination in the region.  The WISD is on the border of Harris and Waller Counties in Texas. The three main cities in the WISD are Prairie View, Waller, and Hockley.  The region is home to Prairie View A&M University, the second oldest state-sponsored institution of higher education in Texas.  The university was founded in 1876 as the "Agricultural and Mechanical College for the Benefit of Colored Youth," in accordance with constitutional provisions pledging that "separate schools shall be provided for white and colored children, and impartial provisions shall be made for both."

Until the 1960s, students in the WISD were assigned to schools on the basis of race.  After the desegregation of the WISD schools, the Prairie View school building now known as H.T. Jones Elementary was used as a mid-level or intermediate campus for all WISD students until 1988.  The

building was closed for renovations in 1988 and reopened in 1992 as a campus for fifth- and sixth-grade students.  In 2002, the WISD formed "community" elementary schools in the four main communities in the district, with Jones Elementary serving the prekindergarten to fourth-grade students in the Prairie View area.  Under the WISD's assignment and transfer policy in effect since 2002, all students in prekindergarten through fourth grade are assigned a "home" campus based on proximity to where they live, but parents may request a transfer to any other elementary school within the district.  Transfer requests are considered on a first-come, first-served, "space available" basis.  No transfer request has been denied since this policy began in 2002.  The WISD currently has one high school (Waller High School), two junior high schools (Waller and Schultz), and four elementary schools (Jones, Roberts Road, Fields Store, and Holleman).

On March 11, 2007, the WISD Board of Trustees unanimously approved a $49.29 million facilities-improvement bond plan to present to voters.  The Board allocated the money to be raised to different projects, including an elementary school, a new district sports stadium, school buses, new technology office space, and renovations at all campuses, including Jones Elementary.  A special election on the bond proposal was held on May 12, 2007.  Voters approved the bonds, 770 in favor to 446 against.

Almost three months later, on August 9, 2007, DeWayne Charleston sued the WISD in state court in Harris County, Texas, alleging that the WISD did not provide sufficient notice of the meetings about the bonds as required under the Texas Open Meetings Act, TEX. GOV'T CODE ANN. § 551.001 *et seq.*  (Docket Entry No. 7, Ex. K).  Charleston sought a declaratory judgment that the May 12, 2007 bond election and the bonds were invalid.  He also sought an injunction preventing the WISD from holding meetings in violation of the Open Meetings Act.

On August 20, 2007, the WISD filed a bond-validation suit in state court in Waller County, Texas under the Texas Expedited Declaratory Judgment Act ("EDJA"), TEX. GOV'T CODE § 1205.001, *et seq.* The EDJA provides as follows:

> An issuer may bring an action under this chapter to obtain a declaratory judgment as to:
>
> (1) the authority of the issuer to issue the public securities;
>
> (2) the legality and validity of each public security authorization relating to the public securities, including if appropriate:
>
>> (A) the election at which the public securities were authorized;
>>
>> (B) the organization or boundaries of the issuer;
>>
>> (C) the imposition of an assessment, a tax, or a tax lien;
>>
>> (D) the execution or proposed execution of a contract;
>>
>> (E) the imposition of a rate, fee, charge, or toll or the enforcement of a remedy relating to the imposition of that rate, fee, charge, or toll; and
>>
>> (F) the pledge or encumbrance of a tax, revenue, receipts, or property to secure the public securities;
>
> (3) the legality and validity of each expenditure or proposed expenditure of money relating to the public securities; and
>
> (4) the legality and validity of the public securities.

TEX. GOV'T CODE § 1205.021. The EDJA also states that a final judgment that "each public security authorization and expenditure of money relating to the public securities was legal" is "binding and conclusive" as to "each adjudicated matter and each matter that could have been raised." TEX. GOV'T CODE § 1205.151(a)-(b). The WISD sought a declaratory judgment that the bond election

5

and bonds were valid.

On August 21, 2007, the state district court in Harris County held a hearing on Charleston's application for a TRO prohibiting the WISD from holding meetings in violation of the Open Meetings Act.  That court denied the TRO.

On August 29, 2007, the state district court in Waller County issued a notice under the EDJA informing residents and property holders in the WISD of the date for the trial in the WISD's declaratory judgment suit.  The trial was set for September 24, 2007.  (Docket Entry No. 7, Ex. M). The court's clerk published the notice in newspapers of general circulation in Waller County, Harris County, and Travis County, as required under § 1205.043 of the EDJA.  (*Id.*, Exs. N, O).

On September 24, 2007, DeWayne Charleston and Elaine Jackson filed this suit in federal court.  They alleged that the WISD provided "unequal educational opportunities for minority students in and around the City of Prairie View" and claimed damages under 20 U.S.C. § 1706 "for the unequal distribution of bond funds to Jones Elementary."  (Docket Entry No. 1 at 4–5).  They also alleged that the bond election violated the Voting Rights Act, 42 U.S.C. § 1973, because the date of the election and the places for early-voting discouraged participation by African-American voters, particularly students attending Prairie View A&M.  Charleston and Jackson alleged that they were denied due process under 42 U.S.C. § 1983 "insofar as they were not provided actual notice" of the Waller County bond-validation proceeding.  (*Id.* at 5).  They further alleged that they "have been denied the equal protection of the laws insofar as facilities in Prairie View are inferior to those found elsewhere in the district."  (*Id.* at 6).

On the same day, Charleston filed an answer in intervention in the Waller County court bond-validation proceeding that the WISD had filed under the EDJA.  Charleston appeared at the

6

Waller County court hearing scheduled for that date.  (Docket Entry No. 7, Ex. Q).  In the answer in intervention, Charleston moved to dismiss the WISD's claim for lack of jurisdiction and moved the Waller County court to abate the state-court proceeding in favor of his just-filed federal-court suit.  Charleston supported his abatement motion by arguing that the WISD "asks this [state] Court to declare that selling its bonds and expending their proceeds is lawful . . . [and] the federal suit asserts that such expenditures violate federal law."  (*Id.*, Ex. Q at 4).  Although he asked the state court to invalidate the bonds, Charleston did not include in his state-court pleadings any allegations that the bonds were racially discriminatory.  The Waller County court denied Charleston's motions to dismiss and to abate the state-court case.

On October 2, 2007, the Waller County court issued a declaratory judgment in the bond-validation suit, upholding the validity of the meeting notices, the bond election, and the bonds.  (Docket Entry No. 7, Ex. R).  The court also set a bond under § 1205.101 of the EDJA, which allows a bond issuer to move to dismiss any opposing party or intervenor other than the attorney general unless that party posts a bond with sufficient security to compensate the bond issuer for any delays caused by the party's continued participation.  Charleston appealed both the state-court judgment and the bond amount set by the state court.

On December 21, 2007, the appellate court held that it lacked jurisdiction to consider Charleston's appeal because he had failed to post the necessary bond.  *Charleston v. Waller Indep. Sch. Dist.*, --- S.W.3d ----, 2007 WL 4465451, at *7 (Tex. App.—Houston [1st Dist.] Dec. 21, 2007, no pet.).  Charleston petitioned the Texas Supreme Court for a writ of mandamus. On December 24, 2007, the plaintiffs served the WISD in this lawsuit.  On March 14, 2008, the Texas Supreme Court denied Charleston's petition for writ of mandamus.

7

The parties sought and obtained expedited action in this federal court.  On March 24, 2008, this court held that the plaintiffs' claims challenging the validity of the May 12, 2007 bond election and bonds were barred by the preclusive effects of the state-court judgment.  On June 27, 2008, this court denied the plaintiffs' motion for reconsideration of that ruling but clarified that the state-court judgment in the bond-validation proceeding did not limit the plaintiffs' ability to litigate in this federal case "their claims that the WISD violates federal equal protection and other rights, including under 20 U.S.C. § 1706, because the district provides 'unequal educational opportunities for minority students in and around the City of Prairie View,' provides 'unequal distribution of bond funds to Jones Elementary,' and because 'facilities in Prairie View are inferior to those found elsewhere in the district.'  And the state-court bond-validation proceeding judgment does not limit the plaintiffs' pursuit of the claims they raised in the third amended complaint, challenging the constitutionality of at-large voting for school board trustees and other aspects of school board elections and governance."  (Docket Entry No. 52, at 37–38).

The plaintiffs did not conduct discovery or pursue this case.  On January 30, 2009, this court set a hearing for "oral argument on the pending motions for summary judgment."  (Docket Entry No. 54).  At the February 25, 2009 hearing, this court noted that the WISD had filed a motion to dismiss or for summary judgment on the remaining allegations in the third amended complaint.  The court informed counsel that the motion would be treated as one for summary judgment.  The parties' prior briefing had discussed the summary judgment standard and attached summary judgment evidence in the form of affidavits and other documents outside the pleadings.

At the February 2009 motion hearing, counsel presented arguments on the plaintiffs' EEOA,

8

equal protection, and declaratory judgment claims.[2]  The court stated that the parties would be permitted to file additional summary judgment evidence and briefs in support of their motion and response.  The minute entry for the hearing states: "The plaintiffs will submit any supplemental affidavits on the issue of funding allocations by March 11, 2009.  The defendant will submit any responsive affidavits by March 25, 2009, and the plaintiffs will submit any reply affidavits by April 1, 2009."  (Docket Entry No. 56).

The plaintiffs filed a supplemental brief but did not seek discovery on the EEOA, equal protection, or declaratory judgment claims and did not submit additional evidence.  The plaintiffs and the WISD filed supplemental briefs on the WISD's motion for summary judgment on the EEOA and equal protection challenges to the condition of the Jones Elementary facilities and on the challenge to the EDJA based on the argument that it was preventing the plaintiffs from litigating their federal challenges to the WISD's treatment of Jones Elementary in this court.

A status conference was held on June 26, 2009.  (Docket Entry No. 64).  The parties reported that the school board election had occurred and that they were gathering and analyzing data.  This court scheduled a bench trial on the constitutionality and legality of at-large voting for school board trustees and other aspects of school board elections and governance for February 16, 2010.  With respect to the outstanding summary judgment motion, this court again asked the parties whether they intended to supplement the summary judgment record.  The plaintiffs declined, stating that they would rely on the previously filed affidavit of DeWayne Charleston.  The WISD stated that it would

---

[2]   The parties agreed to wait until after the May 2009 school board election results and data were available and studied before moving forward on the merits of the  plaintiffs' challenge to at-large voting in the WISD.

supplement the record with Jones Elementary's scores on the 2009 Texas Assessment of Knowledge and Skills (TAKS) test, which is the standardized test used in Texas primary and secondary schools to assess students' attainment of reading, writing, math, science, and social studies skills.  The Texas Education Agency (TEA) publishes TAKS test results for each school and groups them by race — African-American, Hispanic, and White — and by "economically disadvantaged."  The TEA also uses an accountability rating system to rank campuses and districts as Exemplary (the highest possible ranking), Recognized, Academically Acceptable, and Academically Unacceptable (the lowest possible ranking).   On July 8, 2009, the WISD filed a copy of the 2009 TAKS scores for Jones Elementary.  The scores show that a very high percentage of student in each racial subcategory and in the economically disadvantaged category at Jones Elementary passed the TAKS test.  (Docket Entry No. 65, Ex. A).  On August 3, 2009, the WISD filed a document showing that, as a result of the TAKS test scores, the TEA designated Jones Elementary as "Exemplary."  (Docket Entry No. 66).

## II.     The Legal Standard on Summary Judgment

As discussed above, the pending motion is properly reviewed under the summary judgment standard in Rule 56.  The plaintiffs received notice that the motion could be treated as one for summary judgment because the moving party framed its motion as seeking summary judgment in the alternative and attached exhibits.  *Tri-Gen Inc. v. Int'l Union of Operating Engineers*, 433 F.3d 1024, 1029 (7th Cir. 2006); *see also Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998) (holding that no formal notice of conversion by the district court is required when it is apparent that what is nominally a Rule 12(b)(6) motion to dismiss is subject to conversion

to a summary judgment motion, for example, when the motion is captioned in the alternative as a motion for summary judgment and exhibits are attached to the motion; Rule 12(b) does not impose on the district court "an obligation to notify parties of the obvious."); 5C WRIGHT &MILLER, FEDERAL PRACTICE & PROCEDURE § 1366, at 198 (3d ed. 2004).  This court told the parties in February 2009 that this court would treat the motion as one for summary judgment.  The January 30, 2009 order setting the hearing stated that the court would "hear oral argument on the pending motions for summary judgment."  (Docket Entry No. 54).  The plaintiffs responded to the WISD's summary judgment evidence on the merits and presented their own summary judgment evidence. The plaintiffs initially requested the opportunity to present a supplemental affidavit in response to the WISD's summary judgment motion.  Although this court granted the request, the plaintiffs did not submit an additional affidavit but instead relied on the previously filed affidavit of DeWayne Charleston.  The WISD submitted the declaration of its superintendent, Richard McReavy.  The arguments as to the viability of the plaintiffs' EEOA, equal protection, and declaratory judgment claims at issue are properly addressed under the Rule 56 summary judgment standard.

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf*, *Inc. v. Nike*, *Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).  If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *See*

*Celotex*, 477 U.S. at 325.  While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case.  *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation omitted).  "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law."  *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 326 (5th Cir. 2009) (quotation omitted).  "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response."  *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the pleading allegations.  The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim.  *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007).  "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'"  *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075).  In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party.  *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008).

## III.    Analysis

### A.    The EEOA Claim

In the third amended complaint, the plaintiffs alleged that the "dilapidated conditions of Jones Elementary are a vestige of racial segregation" in the WISD.  (Docket Entry No. 31, ¶ 13).

12

According to the plaintiffs, Jones Elementary, built in 1957, was historically "the black school" in the WISD and "is in far worse condition" than other buildings in the district.  The plaintiffs assert that Jones Elementary still has unpaved outdoor basketball courts, "dilapidated facilities," and had the district's only non-air-conditioned gymnasium until after this lawsuit was filed.  According to the plaintiffs, the WISD has "built new elementary facilities in predominately Anglo communities, even in sparsely-populated locations, without upgrading the facilities in Prairie View." (*Id*.).  The plaintiffs allege that the disparate facilities violate the EEOA, 20 U.S.C. § 1706, and seek damages against the WISD for "providing unequal educational opportunities for minority students in and around the City of Prairie View" and "for the unequal distribution of bond funds to Jones Elementary." (*Id*. at ¶ 25).  In the supplemental brief filed in support of the EEOA claim, the plaintiffs argue that "a new elementary school in the predominately African-American community of Prairie View — comparable to those elementary schools in the predominately white parts of the school district — would be an appropriate remedy for the inferior facilities at Jones Elementary." (Docket Entry No. 57 at 2).

The plaintiffs rely on the affidavit of DeWayne Charleston, who attended the Jones school, in the same building it currently occupies, for kindergarten in 1968 and for seventh and eighth grade in 1975 to 1977.  (Docket Entry No. 44, Ex. A, Affidavit of DeWayne Charleston, at ¶ 2). Charleston stated that he has "personally observed the facilities at Jones and the other elementaries in the [WISD], and the Jones campus is in far worse condition than the predominantly-white elementary campuses. . . .  It is visually apparent from the state of the Jones Campus that it has not received funding comparable to that of the predominantly-white elementaries." (*Id.*, at ¶¶ 4–5).

The defendants assert that as a matter of law, such allegations and evidence do not raise a fact issue as to a violation of the EEOA.  The WISD argues that the EEOA does not provide a claim for the type of disparity the plaintiffs allege.  The WISD submitted a declaration by Richard T. McReavy, its District Superintendent.  McReavy stated that after the district was desegregated in the 1960s, the building now known as Jones Elementary was used as a mid-level or intermediate campus for all students in the district, regardless of race, until 1988.  (Docket Entry No. 58, Ex. A, Declaration of Richard T. McReavy, at ¶ 3).  The Jones building was closed for renovations in 1988 and reopened in 1992 as a fifth- and sixth-grade campus, again serving all students, regardless of race.  (*Id.*).  Jones Elementary became the intermediate campus for all fourth-grade students in the WISD until 2002. In 2002, WISD formed "Community Elementary Schools" in each of the four communities in the WISD – Hockley, Texas; Waller, Texas; Prairie View, Texas; and Fields Store, Texas.  Since 2002, Jones Elementary has been designated as the "community school" for prekindergarten to fourth grade students who live in the Prairie View community.  (*Id.*, at ¶ 5).  Since 2002, all WISD elementary-age students are assigned a "home" campus closest to where they live.  Parents may request a transfer to another elementary school within the WISD.  According to McReavy's declaration, no transfer request has been denied since the policy was instituted in 2002.  (*Id.*, at ¶ 7).

McReavy's declaration described the educational programs and accomplishments at Jones Elementary, including programs that serve both gifted students and those with learning disabilities.  There are "wireless networked computers throughout the school."  The average class size is 16 students for each teacher.  Jones Elementary was ranked as a "Recognized" campus by the Texas

Education Agency from 2002 to 2008, an accountability ranking one below the top ranking of "Exemplary."  In 2009, more than 90% of Jones Elementary students in each racial subcategory and in the economically disadvantaged category passed the TAKS test.  (Docket Entry No. 65, Ex. A).  As a result, Jones Elementary was one of three WISD schools awarded an "Exemplary" rating.   Of the four elementary schools in the district, two others, Roberts and Field Store, also had an "Exemplary" rating, and one, Holleman, ranked as "Recognized."  (Docket Entry No. 66).  The TEA also awards schools for performance on additional categories not included in the accountability ratings system.  The awards are known as "Gold Performance" acknowledgments.  Among the criteria are TAKS test scores above the "Commended Performance" level for a certain percentage of the students.  Jones Elementary also received "Gold Performance Acknowledgments" from 2004 to 2008.

McReavy's declaration also described the process the WISD uses in deciding how to allocate educational funds, including the bond funds.   The process for the bond funds included a demographic study done by a group called Population and Survey Analysts.  The results of the study were presented at a November 14, 2006 public meeting that was heavily publicized.  After the meeting, three citizen's communities were formed to "discuss issues related to the results of the survey."  The committees were Financial Planning; Existing Facilities Planning; and Capacity (enrollment, growth, and grade structure).  The chair of the Existing Facilities Planning Committee was a Prairie View council member, Herb Thomas.   The committees presented their final recommendations to the WISD Board on February 19, 2007.  The Board held two public meetings to discuss the recommendations, including the facilities-improvement plan. On March 11, 2007, the

Board approved a $49,290,000 facilities-improvement plan, which included renovations and upgrades in all campuses, school buses, technology support, a fifth elementary school, and the new district stadium.  The election held on March 12 approved the sale of $49.29 million of school bonds to fund the new elementary school, converting two middle schools to 6-8 grade campuses, technology renovations and improvements at all campuses, school buses, and the new district stadium.  (*Id.* at ¶¶ 11-15).

McReavy's declaration presents a breakdown of per-student spending on improvements at Jones Elementary compared to other existing elementary schools in the district.  According to the declaration, the WISD "consistently spends more money on maintenance and operations per student at Jones than at any other elementary school in the district."  (*Id.* at ¶¶ 9, 15).  McReavy asserts that "in the 2008-2009 budget, the allocated maintenance and operational cost per student was $8,488 for Jones (183 students); $4,826 for Holleman Elementary (729 students); $4,891 for Roberts Road Elementary (674 students); and $5,065 for Fields Store Elementary (610 students)."  (*Id.* at ¶ 9).

Section 1706 of the EEOA allows a civil action by an "individual denied an equal educational opportunity, as defined by this subchapter."  20 U.S.C. § 1706.  In adopting the EEOA in 1974, Congress declared that it is the policy of the United States that:

> (1) all children enrolled in public schools are entitled to equal educational opportunity without regard to race, color, sex, or national origin; and (2) the neighborhood is the appropriate basis for determining public schools assignments.

> . . . In order to carry out this policy, it is the purpose of (the EEOA) to specify appropriate remedies for the orderly removal of the vestiges of the dual school system.

20 U.S.C. § 1701.  The EEOA prohibits denying equal educational opportunity on account of race,

16

color, sex, or national origin, in the following enumerated ways:

>       (a) the deliberate segregation by an educational agency of students on the basis of race, color, or national origin among or within schools;

>       (b) the failure of an educational agency which has formerly practiced such deliberate segregation to take affirmative steps, consistent with part 4 of this subchapter, to remove the vestiges of a dual school system;

>       (c) the assignment by an educational agency of a student to a school, other than the one closest to his or her place of residence within the school district in which he or she resides, if the assignment results in a greater degree of segregation of students on the basis of race, color, sex, or national origin among the schools of such agency than would result if such student were assigned to the school closest to his or her place of residence within the school district of such agency providing the appropriate grade level and type of education for such student;

>       (d) discrimination by an educational agency on the basis of race, color, or national origin in the employment, employment conditions, or assignment to schools of its faculty or staff, except to fulfill the purposes of subsection (f) below;

>       (e) the transfer by an educational agency, whether voluntary or otherwise, of a student from one school to another if the purpose and effect of such transfer is to increase segregation of students on the basis of race, color, or national origin among the schools of such agency; or

>       (f) the failure by an educational agency to take appropriate action to overcome language barriers that impede equal participation by its students in its instructional programs.

20 U.S.C. § 1703.

Subchapter 4 of the EEOA, entitled "Remedies," begins by stating: "In formulating a remedy for a denial of equal educational opportunity or a denial of the equal protection of the laws, a court, department, or agency of the United States shall seek or impose only such remedies as are essential to correct particular denials of equal educational opportunity or equal protection of the laws."  20

17

U.S.C. § 1712.  Before implementing a remedy for a denial of equal educational opportunity or of equal protection, a court must "consider and make specific findings on the efficacy in correcting such denial of the following remedies and shall require implementation of the first of the remedies set out below, or of the first combination thereof which would remedy such denial."  20 U.S.C. § 1713.  These remedies, in order, include "assigning students to the schools closest to their places of residence," "permitting students to transfer from a school in which a majority of the students are of their race, color, or national origin to a school in which a minority of the students are of their race, color, or national origin," "the creation or revision of attendance zones," "the construction of new schools or the closing of inferior schools," and "the construction or establishment of magnet schools."  *Id.*

With the exception of § 1703, the EEOA "is devoted to disciplining and limiting the ways in which federal courts may proceed in remedying unlawful school segregation and to identifying and emphasizing those actions and conditions which *do not* constitute denials of equal educational opportunity."  *United States v. City of Yonkers*, 1995 WL 358746, at *2 n.5 (S.D.N.Y. June 14, 1995) (emphasis in original).  The Act was passed "to ensure that courts impose certain vigorous remedies (such as the compulsory transportation of students) only as a last resort, after due and explicit consideration of more moderate alternatives."  *Id.* at 3.

Most recent litigation under the EEOA focuses on an issue not involved here: the requirement under § 1703(f) "to take appropriate action to overcome language barriers that impede equal participation by its students in its instructional programs."  The Supreme Court recently addressed § 1703(f) in *Horne v. Flores,* 129 S.Ct. 2579, 2588 (2009).  In *Horne*, a group of students

enrolled in the English Language Learner ("ELL") program in an Arizona school district and their parents filed suit in federal court on behalf of "all minority 'at risk' and limited English proficient children" in that district. The plaintiffs sought "a declaratory judgment holding that the State of Arizona, its Board of Education, and its Superintendent of Public Instruction (defendants) were violating the EEOA by providing inadequate ELL instruction in Nogales." *Id.* at 2589. In 2000, the district court entered judgment that the State of Arizona's plan for funding its ELL program was arbitrary and that the State had failed to take "appropriate action to overcome language barriers that impede equal participation by its" Spanish-speaking public school students "in its instructional programs." 20 U.S.C. 1703(f). No appeal was taken from this statewide injunction. In 2005, the Arizona Superintendent of Public Instruction, the President of the Arizona Senate, and the Speaker of the Arizona House of Representatives moved under Rule 60(b)(5) of the Federal Rules of Civil Procedure, asking the court to set aside the judgment (and accompanying orders) that the court had entered, arguing that significant changes in factual conditions or in law entitled them to relief. The district court and the court of appeals denied the motion. The Supreme Court reversed.

According to the Supreme Court, "the lower courts focused excessively on the narrow question of the adequacy of the State's incremental funding for [English-learning] instruction instead of fairly considering the broader question, whether, as a result of important changes during the intervening years, the State was fulfilling its obligation" under the Act "by other means." 129 S.Ct. at 2588. The Supreme Court emphasized that this narrow focus on "incremental funding" was error. "The EEOA seeks to provide 'equal educational opportunity' to 'all children enrolled in public schools.' Its ultimate focus is on the quality of educational programming and services provided to

19

students, not the amount of money spent on them." *Id*. at 2604 (internal citation omitted).  The Court emphasized that while the EEOA requires a State to take "appropriate action to overcome language barriers," 20 U.S.C. § 1703(f), it "leave[s] state and local educational authorities a substantial amount of latitude in choosing" how this obligation is met." *Id*. at 2597.  Because "funding is simply a means, not the end," by "focusing so intensively on Arizona's incremental ELL funding, the Court of Appeals misapprehended the EEOA's mandate. And by requiring petitioners to demonstrate 'appropriate action' through a particular funding mechanism, the Court of Appeals improperly substituted its own educational and budgetary policy judgments for those of the state and local officials to whom such decisions are properly entrusted." *Id.*  The Supreme Court remanded for the lower courts to consider whether Nogales was providing ELL that met the EEOA's mandate.

The dissent rejected the criticism that "the lower courts focused so heavily on the original decree's 'incremental funding' requirement that they failed to ask whether 'the State was fulfilling its obligation under' federal law 'by other means.'" *Id*. at 2609 (Breyer, J., dissenting).  While agreeing with the *Horne* majority that the EEOA is a flexible standard, the dissent emphasized that focusing on funding was consistent with that standard when the statutory violation consisted of failing to provide necessary "practices, resources, and personnel."  "[W]hatever might be true of some other case, in this case the failure to provide adequate resources and the underlying subsection (f) violation were one and the same thing."  129 S.Ct. at 2615.  The dissent pointed out that in *Castaneda v. Pickard,* 648 F.2d 989 (5th Cir. 1981), the court construed the "statutory word 'appropriate' [in § 1703(f)] so as to recognize both the obligation to take account of 'the need of

limited English speaking children for language assistance' and the fact that the 'governance' of primary and secondary education ordinarily 'is properly reserved to . . . state and local educational agencies.'" *Id.* at 1008, 1009.  *Casteneda* described the inquiry that a court applying § 1703(f) should conduct.  First, the court should "ascertain" whether the school system was "pursuing" an English-learning program recognized as a legitimate educational theory.  Second, the court should determine "whether the programs and practices actually used by [the] school system are reasonably calculated to implement effectively the educational theory adopted by the school," including that school system was applying necessary "practices, resources and personnel" to make the theory necessary to transform" its chosen educational theory "into reality."  And third, if the practices, resources, and personnel were adequate, the court should go on to ascertain whether "the language barriers confronting students are actually being overcome."  *Id.* at 1010.

The narrowly divided decision in *Horne* leaves lower courts with little clarity on how to approach allegations of funding inadequacies in language programs under § 1703(f) of the EEOA. *Horne* did not discuss the subsection that the plaintiffs rely on in this case; § 1703(b), which requires a school district to "take affirmative steps, consistent with part 4 of this subchapter, to remove the vestiges of a dual school system."  20 U.S.C. § 1703(b).

The WISD argues that the plaintiffs' EEOA claim fails as a matter of law because the Act does not mandate equality in the condition of physical facilities and because the summary judgment evidence does not raise a fact issue as to a violation of § 1703(b) of the EEOA.  The WISD argues that if Congress intended to prohibit inferior school facilities under § 1703(b) or any other section of the EEOA, it would have done so explicitly in the statutory text.  The WISD contends that the

inclusion of "new schools or the closing of inferior schools" as one of the *remedies* for a violation of the explicit prohibitions of the EEOA does not mean that the existence of inferior school facilities is itself a *violation* of the EEOA.

The plaintiffs respond that "the construction of new schools or the closing of inferior schools" is among the remedies for an EEOA violation. (Docket Entry No. 57, at 1). According to the plaintiffs, "[t]his implicitly assumes that inferior school facilities are among the vestiges of dual school systems that the EEOA was intended to eliminate." (*Id.*). The plaintiffs argue that the WISD has failed to remove the vestiges of a dual school system by failing to remedy the inferior facilities at Jones Elementary. (*Id.*, at 2).

The EEOA defines a "dual school system" as one "in which students are assigned to schools solely on the basis of race, color, sex, or national origin." 20 U.S.C. § 1702(a)(1). It is undisputed that Jones Elementary was a "'black school' during the era of segregation." (Docket Entry No. 57, at 2). The plaintiffs do not allege, and the evidence does not show, that the WISD currently maintains a dual school system in student assignments. There is no allegation or evidence that the WISD violates the EEOA by continuing to assign students, employ faculty or staff, assign students to a distant school, or transfer students in a fashion that increases segregation on the basis of race. The undisputed evidence shows that WISD students are assigned to the schools closest to their places of residence, that Jones Elementary provides the appropriate grade level and type of education for each assigned student, and that WISD students are permitted freely to transfer between schools. (Docket Entry No. 58, Ex. A, Declaration of Richard T. McReavy, at ¶¶ 4–8). The record shows that since the 1960s, the WISD has taken affirmative steps to ensure that the district is not a dual

school system in terms of assignments.

The plaintiffs' allegation is that the WISD violates the EEOA by failing to take the affirmative step of building a new school to replace Jones Elementary because its inferior facilities are a vestige of the former dual school system. The EEOA does not define "vestiges of a dual school system." The WISD asserts that "vestiges" are limited to continued discrimination in student assignments. The plaintiffs assert that "vestiges" are broader, extending to disparities that correspond to historical discrimination and that could be remedied by the steps set out in part 4 of the subchapter, which include the "construction of new schools or the closing of inferior schools." § 1713(e).

The plaintiffs have not cited, and this court has not found, any case in which the inferior physical condition of a historically black school has been alleged or found to violate § 1703(b) of the EEOA. *See* Michael A. Rosenhouse, Annotation, *Construction and Application of Equal Educational Opportunities Act (EEOA)*, *20 U.S.C.A. §§ 1701 et seq.*, 38 A.L.R. FED. 2d 201 (2009). Courts have considered disparate funding and resource issues in determining whether defendants have violated § 1703(f), which requires an educational agency to take "appropriate action" to overcome language barriers affecting students. Section 1703(f) is limited to requiring "appropriate steps" to overcome language barriers and does not require that these barriers result from prior practices of a school district. As *Horne* reveals, the role of funding in such determinations is the subject of dispute. By contrast, courts have not held that disparities in physical facilities or funding violate § 1703(b).

Section 1703(b) is violated if a school district that formerly practiced segregation fails to take affirmative steps to remove the vestiges of a dual school system, defined as one that assigns students

to schools on the basis of race or other impermissible criteria.  The statute cannot reasonably be interpreted to require every educational agency that formerly practiced segregation to take every step listed in § 1713(e) or be held to have violated § 1703(b).  Rather, there must first be a finding that there are vestiges of the former dual school system and that the educational agency failed to take affirmative steps – consistent with part 4 – to remove those vestiges.

The prohibited practices of §§ 1703(a) to (e) are assigning students to schools based on race or, if the assignment is not to the closest school, in a way that increases segregation among schools; employing teachers and staff on the basis of race; and transferring students in a way that is intended to and does increase segregation of students on the basis of race.  All these prohibitions deal with assigning students to schools and hiring faculty and staff.  None of these prohibitions deal with physical facilities or even educational programs.  In contrast, § 1703(f) does deal with a specific type of educational program, those designed to overcome language barriers.  The EEOA does not support the very broad approach to defining the "vestiges of a dual school system" that the plaintiffs advocate.  The cases the plaintiffs cite in their supplemental brief, (Docket Entry No. 57 at 2), to support their argument that the failure to improve the physical condition of a school can violate § 1703(b) as a failure to remove "vestiges of a dual school system," are not on point.  The cases are instead consistent with the focus of § 1703(a) to (e) in addressing racially discriminatory student assignment plans.   It is telling that no case finds an EEOA violation because a historically black school in a formerly segregated school district is in physically poor condition compared to "white" schools.

The fact that § 1713(e) includes as the fifth of the listed remedies for a § 1703 violation building a new school or closing an inferior school does not mean that a failure to do so violates

24

§ 1703(b).  The subchapter 4 remedies are designed to limit the remedies a court can use in addressing a denial of equal educational opportunity and were designed to reduce the ability of courts to order busing to overcome segregation in student attendance at particular schools.  There is no basis in the statute or the cases applying it to support the argument that the inclusion of the remedy in subchapter 4 makes the failure to use that remedy a violation of § 1703(b).

Even taking a broader view of § 1703(b), the summary judgment record does not raise a fact issue as to a violation.  It is undisputed that Jones Elementary is the historically black elementary school in the WISD.  The plaintiffs have alleged that it is a "dilapidated" physical facility, citing an unpaved outdoor basketball court and – until this lawsuit was filed – a non-air-conditioned gym.  But the summary judgment record supporting the allegation is quite sparse.  It consists of Charleston's affidavit stating, based on his personal observations, that "the Jones campus is in far worse condition than the predominantly-white elementary campuses" and that "[i]t is visually apparent from the state of the Jones Campus that it has not received funding comparable to that of the predominantly-white elementaries."  (Docket Entry No. 44, Ex. A, Affidavit of DeWayne Charleston, at ¶ 4).  The defendants have submitted a declaration showing that while the physical building housing Jones Elementary is over fifty years old, it has been renovated substantially.  From 1992 to 2002, Jones Elementary was the only WISD school for fifth and sixth graders, then for fourth graders, regardless of race.  The declaration describes how Jones Elementary offers a full range of educational programs and does that well.  (Docket Entry No. 58, Ex. A, Declaration of Richard T. McReavy, at ¶ 5) (stating that "school-wide Title I reading and math; Boys Town social skills; Accelerated Reader; Discovery Gifted and Talented; the inclusion of students with disabilities; Writing/Reading/Math computer lab; Content Mastery; and wireless networked

25

computers throughout the school" are "[a]mong the programs and enrichment opportunities offered at Jones" Elementary).

Even if "vestiges of a dual school system" under § 1703(b) was construed broadly, neither the statute nor the case law supports the conclusion that the relatively poorer physical facility of a historically black school, standing alone, would violate the statute. As the majority and the dissent in *Horne* emphasize, the purpose of the EEOA is equality of educational opportunity. The *Horne* dissent stated that an emphasis on funding was relevant when the statutory violation under § 1703(f) consisted of failing to provide necessary "practices, resources, and personnel." *Horne*, 129 S.Ct. at 2604, 2609. In the present case, the evidence is that the educational practices, resources, personnel, and programs at Jones Elementary are of good quality, equaling or exceeding the other elementary schools in the WISD under the accountability standards set by the State.

Although the plaintiffs have alleged that the disparate facility is the result of the WISD's failure to remove the vestiges of a dual school system, the summary judgment evidence as to the physical condition of Jones Elementary and as to the quality of the education it provides do not raise a fact issue as to whether the WISD has violated the EEOA by failing to take the affirmative steps of the remedies outlined in § 1713(e). The WISD's motion for summary judgment on the EEOA claim is granted.

### C.    The Equal Protection Claim

In the amended complaint, the plaintiffs alleged that they have been denied equal protection of the law "insofar as facilities in Prairie View are inferior to those found elsewhere in the district." (Docket Entry No. 31, at ¶ 35). The plaintiffs point to the new $17 million football stadium for Waller High School and the inferior facilities at Jones Elementary compared to predominantly white

elementary schools.  Citing *Board of Educ. v. Rowley*, 458 U.S. 176 (1982), the WISD argues that the Equal Protection Clause "does not require States to expend equal financial resources on the education of each child."  *Id.* at 199-200.  The WISD asserts that it has exercised lawful authority to determine how to allocate funds and that the funds are spent according to the needs of each school.  The WISD argues that its spending decisions are subject to rational basis review and cannot be overturned unless shown to be arbitrary or irrational.

The standard of review for the challenged funding decision by the WISD depends on whether the record contains evidence of discriminatory intent.  "[E]qual protection analysis requires strict scrutiny of a legislative classification *only* when the classification impermissibly interferes with the exercise of a fundamental right or operates to the peculiar disadvantage of a suspect class." *Massachusetts Board of Retirement v. Murgia*, 427 U.S. 307, 312, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976) (emphasis added).  The law is clear that education is not a fundamental right triggering strict scrutiny.  *See San Antonio Independent School Dist. v. Rodriguez*, 411 U.S. 1, 15, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973).  Rational basis review applies unless the plaintiffs can show discriminatory intent, that is, that the purpose of the funding decisions was discriminatory.

"[O]fficial action will not be held unconstitutional solely because it results in racially disproportionate impact . . . .  Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Village of Arlington Heights v. Metropolitan Housing Development Corp*., 429 U.S. 252, 264-65, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *see also Washington v. Davis*, 426 U.S. 229, 239-42, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976).  It is not enough simply to show that the challenged practice results in discrimination in its application and that the discriminatory consequences were foreseen at the time of its adoption.  *Id.*  An "assertion that

27

discriminatory impact in school repair and replacement constitutes intentional discrimination can no more be true than any other showing of discriminatory impact, which [is] generally insufficient for a showing of intentional discrimination." *Price v. Austin Indep. Sch. Dist.*, 945 F.2d 1307, 1321 n.9 (5th Cir. 1991). In the summary judgment context, when the defendant has pointed to the absence of discriminatory intent, it becomes the plaintiff's responsibility to produce such evidence. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

"'Discriminatory purpose,' . . . implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Personnel Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870, 887-88 (1979) (citation omitted). In *Village of Arlington Heights*, the Court noted that "[d]etermining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." 429 U.S. at 266, 97 S.Ct. at 564, 50 L.Ed.2d at 465. The Court listed several nonexhaustive subjects of proper inquiry in determining whether racially discriminatory intent exists. Whether the impact of the official action bears more heavily on one race than the other is an "important starting point," but rare is the case where a "clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face." *Id.* at 266. "[I]mpact alone is not determinative, and the Court must look to other evidence." *Id.* Other appropriate evidence includes the historical background of the challenged government decision – "particularly if it reveals a series of official actions taken for invidious purposes," the specific

28

sequence of events leading up to the challenged decision, departures from the normal procedural sequence, and the legislative or administrative history.  *Id.*

In *Citizens Concerned About Our Children v. School Board of Broward Cty.*, 193 F.3d 1285(11th Cir. 1999), the plaintiffs, African-American schoolchildren, brought an equal protection claim against the school district, alleging that their school had "facilities inferior to other Broward schools because [it was] majority black" and that their school received "lower funding than other schools because it [was] majority black."  *Id.* at 1291.  The appellate court affirmed the grant of summary judgment in favor of the school board, observing that the plaintiffs had not identified or submitted evidence of discriminatory intent.  *Id.* at 1295.  The plaintiffs had not asked "questions of how the Board distributes money among schools in the County, how funding requests are made, how the Board weighs requests, or how needs and priorities may differ from school to school."  *Id.* "In short, they did not elucidate the process in a level of detail that might expose discriminatory intent.  Instead, the plaintiffs point only to the disparities between schools that are the basis of their claims."  *Id.*  The court held that pointing to the disparities between the schools "was not enough evidence of intent when there are so many imaginable reasons for differences."  *Id.*

Similarly, in *Parents, Alumni, and Friends of Taylor School v.  City of Norfolk*, 37 F.Supp.2d 435 (E.D. Va. 1999), the plaintiffs alleged that the school district's decision to demolish and rebuild, at significant expense, a predominantly white school built in 1917, was a violation of equal protection because the school district chose not to spend money on schools in need of repair in predominantly black neighborhoods.  The court noted that the plaintiffs had not presented any "direct evidence of the spending practices or motivations of the School Board."  *Id.* at 445.  As

circumstantial evidence of discriminatory intent, the plaintiffs presented evidence that the spending for the new elementary school was greater than any other elementary school in the state. The plaintiffs argued that the significant disparity in funding was the result of "very irregular decision-making" which showed racial discrimination. *Id.* The court refused to "blindly draw an inference from the disparate spending and assume that the defendants' intent was racially discriminatory." *Id.* at 444. According to the court, the fact that the new school cost more than any other school was not evidence, in and of itself, of discriminatory intent. The evidence as to why the costs were higher was unclear and there was no basis to conclude that the spending disparity was based on race. *Id.* at 445.

The WISD has submitted the McReavy declaration as evidence that the district's funding decisions were not made with discriminatory intent. McReavy states that the WISD bond funds were allocated based on an independent demographic study, citizen committee meetings, and the recommendations of those committees. McReavy also states that more bond funds were spent per student at Jones Elementary than at other elementary schools in the district.

As evidence that the funding allocations were made with discriminatory intent, the plaintiffs rely on DeWayne Charleston's affidavit testimony that Jones Elementary is dilapidated and has inferior facilities. The plaintiffs also rely on evidence that the WISD spent $17 million of the 2007 bond proceeds on a new football stadium for Waller High School. And the plaintiffs point to the historical segregation and discrimination based on race that has occurred in the WISD and in Prairie View. The plaintiffs' evidence is similar to the evidence found insufficient in *Citizens Concerned* and *Taylor School*. The plaintiffs have not submitted evidence showing discriminatory intent in how

the WISD distributes money among schools in the district, in how the WISD weighs funding requests, or in how needs and priorities may differ from school to school. To the contrary, the only evidence in the record on these issues shows a lack of discriminatory intent in how these funding decisions were made. McReavy's declaration states that the "bond funds were allocated based on an extensive process of demographic study and community involvement." (Docket Entry No. 58, Ex. A, Declaration of Richard T. McReavy, at ¶ 11). A public meeting was held on November 14, 2006 at which the WISD presented the results of an independent demographic study. Three citizen committees were formed: (1) financial planning; (2) existing facilities planning; and (3) capacity planning. These committees, which were open and advertised to the public and included citizens of Prairie View, met several times in late 2006 and early 2007 to discuss plans for the district. On February 19, 2007, the committees made recommendations to the WISD board of trustees. On March 11, 2007, the WISD Board of Trustees unanimously approved a $49.29 million facilities improvement bond plan to present to voters. The facilities-improvement plan allocated the money to be raised toward different projects, including a new elementary school, a new district sports stadium, school buses, new technology office space, school buses, and renovations at all campuses. A special election on the bond proposal was held on May 12, 2007. Voters approved the bonds, 770 in favor to 446 against. The validity of the meeting notices, bond election, and bonds was upheld by the Waller County court in October 2007.

The WISD has submitted evidence that it "consistently spends more money on maintenance and operations per student at Jones than at any other elementary school in the district." (Docket Entry No. 58, Ex. A, Declaration of Richard T. McReavy at ¶ 9). In the 2008-2009 school-year

budget, the allocated maintenance and operational cost per student was $8,488 for Jones Elementary (183 students), $4,826 for Holleman Elementary (729 students), $4,891 for Roberts Road Elementary (674 students), and $5,065 for Fields Store Elementary (610 students).  (*Id.*).  The total dollar-figure allocated to Jones Elementary is smaller than that allocated to the other elementary schools, but Jones has far fewer students than those schools.  The WISD has also submitted evidence that it "spent more of its funds from its 2007 bond election at Jones than at any other existing elementary school in the district.  The bond plan allocated spending of $1,525 per student at Jones; $874 per student at Holleman Elementary; $874 per student at Roberts Road Elementary; and $135 per student at Fields Store Elementary."  (*Id.*, at ¶ 10).

The record does not raise a fact issue as to whether the WISD's funding allocation and spending decisions were made with discriminatory intent.  There is no evidence that the procedures involving citizen committees and bond funding were atypical or calculated to have a discriminatory impact on African-Americans in the WISD.  Nor is there evidence in the record of "a series of official actions taken for invidious purposes."  The disparate impact of the WISD's funding allocations as reflected in the disparate facilities is insufficient, standing alone, to raise a fact issue as to whether the WISD acted with discriminatory intent.

The WISD argues that its spending decisions satisfy rational basis review.  The WISD asserts that its funding allocation decisions were reasonable because they were made based on community input and a good-faith assessment of the needs of the schools within the district.  The WISD notes that it does not own Jones Elementary, but rather leases the property under a five-year lease from the Texas A&M System.  The WISD asserts that its decision not to undertake capital improvements

32

at Jones Elementary is "especially sound" because such improvements are not practical on a short-term leased property.  The plaintiffs argue that the district's spending decisions do not satisfy the rational basis test.  But the only evidence the plaintiffs submit is Charleston's declaration about the condition of Jones Elementary and the WISD's decision to spend $17 million on a new football stadium.

In *San Antonio Independent School Dist. v. Rodriguez*, 411 U.S. 1, 35, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973), the parents of Mexican-American children in an urban school district challenged Texas's system of financing its public schools.  Under that system, half of the funds came from a state program, while the rest of the funds came from a local property tax.  The plaintiffs claimed that the system, because of varying wealth in the areas in which the school districts were located, created "substantial interdistrict disparities" throughout the state. *See id.* at 15.  The Supreme Court applied rational basis review and upheld the financing system.  The Court held that it "lack[ed] both the expertise and the familiarity with local problems so necessary to the making of wise decisions with respect to the raising and disposition of public revenues." *Id.* at 41.  Accordingly, state officials and local school districts are owed a degree of deference under the rational-basis standard of review.

Thirteen years later, however, the Supreme Court made clear that its holding in *Rodriguez* was not meant to declare constitutional, as a matter of law, all funding variations that might result from a state's public school funding policy.  *See Papasan v. Allain*, 478 U.S. 265, 287, 106 S.Ct. 2932, 2945, 92 L.Ed.2d 209 (1986).  *Papasan* involved claims by the school children and school officials of 23 Mississippi counties that the state's unequal distribution of funds from "Sixteenth Section or Lieu Lands" created a disparity between the plaintiffs' schools and other schools in the

state.  *See id.* at 265-75.  The Fifth Circuit affirmed the district court's dismissal of the plaintiffs'

Equal Protection claim, reasoning that *Rodriguez* controlled the decision.  *See id.* at 275.  The

Supreme Court, however, disagreed and reversed:

> *Rodriguez* did not . . . purport to validate all funding variations that
> might result from a State's public school funding decision.  It held
> merely that the variations that resulted from allowing local control
> over local property tax funding of the public schools were
> constitutionally permissible in that case."  *Id.*
>
> Here, the petitioners' claim goes neither to the overall funding system
> nor to the local ad valorem component of that system.  Instead, it
> goes solely to the Sixteenth Section and Lieu Lands portion of the
> State's public school funding.  And, as to this claim, we are
> unpersuaded that *Rodriguez* resolves the equal protection question in
> favor of the State. The allegations of the complaint are that the State
> is distributing the income from Sixteenth Section lands or from lieu
> lands or funds unequally among the school districts, to the detriment
> of the Chickasaw Cession schools and the students . . . .

*Id.* at 286-88.  The Court in *Papasan* agreed with *Rodriguez* that rational basis review applies in the

context of school funding decisions.  The Court held that it was error to dismiss the complaint for

failure to state a claim under Rule 12(b)(6).  The Court in *Papasan* remanded to the lower court for

reconsideration of the rational basis standard under the particular facts of the case.

Under the rational basis test, a school district's spending decision "carries with it a

presumption of rationality that can only be overcome by a clear showing of arbitrariness or

irrationality."  *See Kadrmas v. Dickinson Public Schools*, 487 U.S. 450, 108 S.Ct. 2481, 101 L.Ed.2d

399 (1988).  The decision will not be overturned "unless the varying treatment of different groups

or persons is so unrelated to the achievement of any combination of legitimate purposes that [the

court] can only conclude that the legislature's actions were irrational."  *Id.* at 463 (quoting *Vance*

*v. Bradley*, 440 U.S. 93, 97, 99 S.Ct. 939, 943, 59 L.Ed.2d 171 (1979)).  A plaintiff challenging such

a decision must show "that the legislative facts on which the decision is apparently based could not reasonably be conceived to be true by the governmental decisionmaker." *Id.* (citation omitted). "Even if the court is convinced that the political branch has made an improvident, ill-advised, or unnecessary decision, it must uphold the act if it bears a rational relation to a legitimate governmental purpose." *Cash Inn of Dade*, *Inc. v. Metro. Dade Cty.*, 938 F.2d 1239, 1241 (11th Cir. 1991). Rational basis review is "a paradigm of judicial restraint;" "[w]here there are 'plausible reasons' for [the government decision], '[the] inquiry is at an end.'" *FCC v. Beach Communications*, *Inc.*, 508 U.S. 307, 314, 113 S.Ct. 2096 (1993) (quotation omitted); *see also Western & Southern Life Ins. Co. v. State Bd. of Equalization*, 451 U.S. 648, 672, 101 S.Ct. 2070, 68 L.Ed.2d 514 (1981) ("the Equal Protection Clause is satisfied if we conclude that the California Legislature rationally could have believed" that the measure promoted its objectives) (emphasis in original).

The WISD asserts that the short-term lease for Jones Elementary is a sound reason for deciding not to spend more money on improving the facilities at Jones Elementary. This explanation is not persuasive. The record shows that the lease has been renewed repeatedly, that the WISD intends to continue to renew the lease, that the WISD received a draft renewed lease a month after McReavy's reliance on the short lease term as a basis for the WISD's decision not to spend more money on the property, and that there is no indication of any unwillingness by the lessor to renew the lease indefinitely. However, a challenged "[g]overnmental action only fails rational basis scrutiny if no sound reason for the action can be hypothesized." *Lauth v. McCollum*, 424 F.3d 631, 634 (7th Cir. 2005); *see also Unruh v. Moore*, 2009 WL 1310981, at *2 (5th Cir. May 12, 2009)

("To pass muster under rationality review, the plaintiff must rule out all possible reasonable justifications for disparate treatment, not merely the justification provided by the government official."). "[T]he 'actual' reason provided by the [government] is immaterial." *Unruh*, 2009 WL 1310981, at *2.

Based on the record evidence, much of which is uncontroverted, the WISD's spending decisions satisfy rational basis review. The plaintiffs have failed to meet their "heavy burden" of raising a fact issue as to whether the spending decisions were "so unrelated to the achievement of any combination of legitimate purposes that [the court] can only conclude that the [WISD's] actions were irrational." The record shows several reasonable justifications for the WISD's allocation of the 2007 bond proceeds. The decisions made by the WISD Board of Trustees were made based on an independent demographic study, several citizen committee meetings, and the recommendations of those committees. The bulk of the $49 million of bonds was spent as follows: $17 million on the football stadium; $15 million on a new elementary school; $9 million on a middle school conversion; and $3 million on new buses. (Docket Entry No. 58, Ex. A, Declaration of Richard T. McReavy, at ¶ 15). The money spent on existing elementary school facilities was a small portion of the bond funds. (*Id.*). The WISD's spending decisions were not so unrelated to a legitimate government purpose that the only conclusion to be drawn is that the decisions were irrational. The Board could rationally decide that a new football stadium for Waller High School, the only high school in the district, would benefit all students district-wide. And the Board could decide for legitimate reasons that a new elementary school, built to relieve overcrowding for elementary students, was needed more than repairs or renovations to Jones Elementary. *See Citizens*

*Concerned*, 193 F.3d at 1295 (holding that conceivable reasons for differences in funding included "when the Board decides for legitimate reasons that School X needs a new roof more than School Y needs a new gym floor").

Despite ample opportunity, the plaintiffs have submitted no evidence other than the declaration of Charleston generally describing Jones Elementary's physical condition. The record does not raise a genuine fact issue material to determining whether the WISD's spending decisions were irrational or wholly arbitrary. This court grants the WISD's motion for summary judgment on the plaintiffs' equal protection claim.

### C.      The Declaratory Judgment Claim

On October 2, 2007, the Texas district court in Waller County issued its judgment under the Texas Expedited Declaratory Judgment Act (EDJA), TEX. GOV'T CODE § 1205, *et seq.* The judgment stated that "as to all matters adjudicated and those that could have been raised, [is] forever binding and conclusive against the Attorney General of Texas, the Comptroller, Intervenors, DeWayne Charleston, and all other interested parties. . . ." (Docket Entry No. 32, Ex. J). The court's judgment stated that it was "a permanent injunction against the institution or prosecution by any person or entity of any new or existing action or proceeding contesting [the validity of the bonds and the authorization process] . . .; and any matter adjudicated by the Court's judgment in this action; and any matter that could have been raised in these proceedings." (*Id.*). The language of the state court's judgment and order tracks the language of the EDJA.

The plaintiffs sought a declaratory judgment in this court that the Texas EDJA: (1) is unconstitutionally broad and infringes their First Amendment right to petition for redress of

grievances; (2) conflicts with Article I, Section 13 of the Texas Constitution; (3) conflicts with the Supremacy Clause and federal preemption to the extent it compels parties to bring federal claims in a state forum; and (4) conflicts with the Supremacy Clause and federal preemption to the extent it purports to allow a state court to enjoin *in personam* proceedings in federal court.  (Docket Entry No. 31, at 10).  The plaintiffs also sought to "enjoin the state courts from enforcing their orders which purport to prohibit the Plaintiffs from bringing their claims before this Court."  (*Id.*, at 12). On June 27, 2008, this court rejected the plaintiffs' arguments that the EDJA is unconstitutional because it conflicts with the Texas Constitution and with the Supremacy Clause.  This court held that granting relief on the plaintiffs' federal claims, as they relate to the 2007 bonds, would require "this court to reject the Waller County Court's judgment that the May 2007 bond election and the bonds are valid." (Docket Entry No. 52).  To the extent that the plaintiffs' federal claims challenged the 2007 bonds or election, this court held that they were barred by *res judicata* and *Rooker-Feldman*.  (*Id.*).

The WISD argues that to the extent the plaintiffs challenge the EDJA outside the context of the 2007 bonds as an overbroad infringement on First Amendment rights, this court lacks jurisdiction over the claims.  The WISD argues that the plaintiffs do not have standing to challenge the EDJA because they have not shown a particularized, concrete injury.  Rather, according to the WISD, the plaintiffs have shown that they share a generalized injury with the public at large — alleging that their injuries arise "as African-American voters and residents of the Prairie View community" — which is insufficient to create standing.  The plaintiffs also lack standing, according to the WISD, because they cannot establish that "a favorable judgment is likely to redress the

injury."  The WISD asserts that the plaintiffs have not shown how a declaratory judgment that the EDJA is unconstitutional would affect them, in the absence of a pending or upcoming bond-validation proceeding or election that could involve the EDJA.

The plaintiffs argue that they have standing to challenge the constitutionality of the EDJA because the state court's order "purports to enjoin them from litigating in any court, including this one." (Docket Entry No. 41, at 16).  The plaintiffs argue that although this court decided that *res judicata* bars the federal claims that could have been raised in state court to challenge the 2007 bonds, this court may nonetheless enjoin the state court from enforcing its injunction because the EDJA, the source of the state court's power to issue the injunction, is unconstitutional.  The plaintiffs assert that "federal district courts have repeatedly enjoined state courts from purporting to enjoin proceedings in federal court." (Docket Entry No. 51, at 4).  The plaintiffs contend that they have the "right to exhaust their remedies before this Court and the federal appeals court without interference from the state court."  (Docket Entry No. 41, at 17).

In prior opinions, this court analyzed both the preclusive effects of the state court's judgment and the constitutionality of the EDJA as it applied to the 2007 bond-validation proceeding.  A plaintiff does not have the right to avoid the preclusive effects of a prior state-court final judgment and relitigate claims in federal court that he brought or could have brought in the prior state-court proceeding.  To the contrary, if a plaintiff brings federal claims in a later federal-court suit, "whether or not a plea of *res judicata* in the second suit would be good is a question for the federal court to decide."  *Donovan*, 377 U.S. at 412.  This court has held that the plaintiffs are precluded from litigating in this suit their claims based on the 2007 bonds and bond-validation proceeding, but are

not precluded from challenging the allegedly inequitable allocation of other funding for Jones Elementary and the constitutionality of the WISD's election practices.  (Docket Entry No. 52, at 37–38).  It was "the application of general preclusion principles, . . . not the EDJA statement of preclusion, that support[ed] the result in this case."  (*Id.*, at 28).  The record provides no basis for an order enjoining the state court's injunction, as the plaintiffs seek.

To the extent the plaintiffs seek a declaratory judgment that the EDJA is an unconstitutionally overbroad infringement on First Amendment rights apart from its application to the 2007 bond-validation proceeding, they have not shown a basis for such relief.  Courts have rejected constitutional challenges to bond-validation proceeding statutes with notice provisions similar to the EDJA's.  *See*, *e.g.*, *Denham Springs Econ. Dev. Dist. v. All Taxpayers*, *Property Owners and Citizens of Denham Springs Econ. Dev. Dist.*, 945 So.2d 665, 683-83 (La. 2006) (finding that "no constitutionally protected property interest is involved" in a bond validation proceeding, such that publication notice is constitutionally sufficient); *Ambac Indem. Corp. v. Akridge*, 262 Ga. 773, 425 S.E.2d 637, 639 (Ga. 1993) (finding that publication notice "satisfied the constitutional requirement of due process by giving residents and taxpayers adequate notice of the subject of the hearing and of their opportunity to be heard"); *Thomas v. Ala. Mun. Elec. Auth.*, 432 So.2d 470, 744 (Ala.1983) (noting that "provisions, authorizing service of process by newspaper publication in 'bond validation suits,' have been upheld by this court against the claim that such provisions do not comport with due process requirements").  And courts have upheld the preclusive effect of a judgment entered in a bond-validation proceeding created by a state statute similar to the EDJA.  *See*, *e.g.*, *Woodham v. City of Atlanta*, 283 Ga. 95, 657 S.E.2d 528, 531 (2008) (noting that

"the Bond Validation Law is the sole means for a citizen-intervenor with notice to contest the validity of the revenue bonds," and holding that "[s]ince [the plaintiff's] claims were adequately addressed and adjudicated in the validation proceeding, his [subsequent] declaratory judgment petition [challenging the allegedly improper diversion of bond funds to noneducational projects] was properly dismissed"); *McLeod v. Vista Unified Sch. Dist.*, 158 Cal. App. 4th 1156, 71 Cal. Rptr. 3d 109, 120 (2008) (finding that the plaintiffs, in asserting taxpayer waste causes of action to prohibit the defendant school district from issuing the remaining bonds authorized by an approved proposition, "challenge[d] the validity of the bond issuance," such that the plaintiffs' action "was subject to the validation statutes" and was barred under the statutes' 60-day limitations period); *Denham Springs*, 945 So.2d at 687 (finding that the plaintiffs' claims challenging the ability of other taxing entities to cooperate in the bond-funded project and to pledge their tax monies to secure the bonds were barred because the period for challenges to a bond resolution had expired, "and a conclusive legal presumption of the validity of the bonds and the security provisions was established," after which time "courts have no authority to consider any challenges as to these matters"); *Keys Citizens for Responsible Government*, *Inc. v. Fla. Keys Aqueduct Auth.*, 795 So.2d 940, 948 (Fla. 2001) (determining that a "final judgment [as to the validity of bonds] will necessarily foreclose any further challenges").

This court's ruling on the preclusive effect of the state-court judgment was narrow, based on the specific facts of the state and federal proceedings, including that the plaintiffs had not challenged the bond election until months after it took place, that the plaintiffs intervened in the state court bond-validation proceeding, and that the plaintiffs did not plead federal law claims in the

bond-validation proceeding.  There is no basis to determine whether, much less how, the EDJA would prevent the plaintiffs, if they believed that a future pending bond election violated federal constitutional or statutory rights, from going to federal court before the election to raise constitutional or federal-law challenges or to otherwise seek relief.

A plaintiff seeking injunctive or declaratory relief must demonstrate a substantial likelihood that he will suffer injury in the future.  *See City of Los Angeles v. Lyons*, 461 U.S. 95, 111, 103 S.Ct. 1660, 1670, 75 L.Ed.2d 675 (1983) (plaintiff's assertion that he may again be subject to illegal chokehold does not create actual controversy; absent a sufficient likelihood that he will again be wronged in a similar way, the plaintiff is not entitled to injunctive relief); *Golden v. Zwickler*, 394 U.S. 103, 109, 89 S.Ct. 956, 960, 22 L.Ed.2d 113 (1969) (plaintiff who was no longer likely to run for election had not presented case or controversy of "sufficient immediacy and reality" to allow declaratory judgment challenging constitutionality of statute prohibiting anonymous handbills directly pertaining to election campaigns); *Geiger v. Jowers*, 404 F.3d 371, 375 (5th Cir. 2005) (plaintiff lacked standing to seek prospective injunctive relief for a First Amendment violation when he did not show a likelihood of future harm by way of a real and immediate threat that the defendants would violate his First Amendment rights in the future).  The plaintiffs in this case are unable to identify a definable future harm from the EDJA that would entitle them to a declaratory judgment.

The plaintiffs are not precluded by the EDJA or the state court's judgment from litigating their EEOA, equal protection, and at-large voting claims in this federal court.  The plaintiffs have not identified any basis for concluding that the EDJA would prevent them from filing suit to

challenge a future bond election if they believed it unconstitutional.  There is no ripe controversy that would allow this court to issue a declaratory judgment that the EDJA is unconstitutional as an overbroad infringement on First Amendment rights.  The WISD's motion for summary judgment on the claims for a declaratory judgment and an injunction is granted.

## IV.    Conclusion

The WISD's motion for summary judgment is granted as to the plaintiffs' claims for a declaratory judgment and for injunctive relief, as well as the unequal funding claims based on the EEOA and the Equal Protection clause.

SIGNED on September 24, 2009, at Houston, Texas.

Lee H. Rosenthal
United States District Judge